IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Gerald A. and Dorothy D. Sandusky, :
                       Petitioners   :
                                  :
         v.                     :
                                  :
Pennsylvania State Employees' :
Retirement Board,              : No. 60 C.D. 2015
               Respondent : Argued: October 7, 2015

BEFORE:   HONORABLE DAN PELLEGRINI, President Judge
               HONORABLE BERNARD L. McGINLEY, Judge
               HONORABLE ROBERT SIMPSON, Judge
               HONORABLE MARY HANNAH LEAVITT, Judge
               HONORABLE P. KEVIN BROBSON, Judge
               HONORABLE PATRICIA A. McCULLOUGH, Judge
               HONORABLE ANNE E. COVEY, Judge

OPINION BY
PRESIDENT JUDGE PELLEGRINI        FILED: November 13, 2015

        Gerald A. Sandusky and Dorothy D. Sandusky, husband and wife, petition for review of the order of the Pennsylvania State Employees' Retirement Board (Board) affirming the Pennsylvania State Employees' Retirement System's (SERS) finding that he was an "employee" of The Pennsylvania State University (PSU) even though he had not been on its payroll since 1999. The effect of that finding resulted in the forfeiture of his pension under the Public Employee Pension Forfeiture Act (Pension Forfeiture Act)[1] due to his 2012 criminal convictions. Because we find that nothing in the record in any way establishes that Mr. Sandusky

_____

[1] Act of July 8, 1978, P.L. 752, 43 P.S. §§1311–1315.

was a PSU employee when the underlying criminal acts were committed, we reverse the Board's decision.

## I.

Pursuant to Mr. Sandusky's employment contract with PSU, he began working as a football coach and an instructor in intercollegiate athletics for PSU effective March 15, 1969, at which time he elected to become a member of SERS and designated Mrs. Sandusky as his survivor annuitant at the time of his retirement.[2] He was promoted to an assistant professor on July 1, 1975, and became a tenured professor on July 1, 1980.

As per a "Retirement Perquisites" Agreement Mr. Sandusky entered into with PSU, his employment as a football coach terminated after the 1999 football season, at which time his SERS account was credited with 30.3533 years of service. Mr. Sandusky elected to withdraw his accumulated deductions and to receive a monthly annuity providing his designated survivor annuitant, Mrs. Sandusky, a fifty percent (50%) survivor annuity benefit. Immediately after his retirement as a football coach, PSU rehired Mr. Sandusky on a ninety-five (95) day emergency basis to continue coaching the football team through the end of the 1999 season pursuant to 71 Pa. C.S. §5706 (a.1).[3]

---

[2] Mrs. Sandusky's potential SERS benefits are derived entirely from Mr. Sandusky's pension benefits in that she will receive a fifty percent (50%) survivor annuity if she survives him. She does not, however, have an independent relationship with SERS.

[3] Regarding the return to State service during an emergency:

> When, in the judgment of the employer, an emergency creates an increase in the work load such that there is serious impairment of

**(Footnote continued on next page…)**

In accordance with the Retirement Perquisites Agreement, PSU provided Mr. Sandusky a lump-sum payment of $168,000.00, complimentary season tickets to PSU football and basketball games, free access to PSU fitness and training facilities, a PSU office and phone in the East Area locker room complex, and agreed to continue to "work collaboratively" with Mr. Sandusky regarding The Second Mile[4] after his retirement. (Reproduced Record [R.R] at 385a–386a.)

Subsequently, on October 9, 2012, Mr. Sandusky was convicted in the Court of Common Pleas of Centre County for indecent assault pursuant to 18 Pa. C.S. §3126(a)(8)[5] and for involuntary deviate sexual intercourse pursuant to 18 Pa. C.S.

---

**(continued…)**

> service to the public, an annuitant may be returned to State service for a period not to exceed 95 days in any calendar year without loss of his annuity. In computing the number of days an annuitant has returned to State service, any amount of time less than one-half of a day shall be counted as one-half of a day. For agencies, boards and commissions under the Governor's jurisdiction, the approval of the Governor that an emergency exists shall be required before an annuitant may be returned to State service.

71 Pa. C.S. §5706 (a.1).

[4] The Second Mile is "a Pennsylvania non-profit organization founded in 1977 by [Mr. Sandusky] when he was the Defensive Coordinator of the PSU football team. The Second Mile began as a group foster home, but, over the course of almost 35 years, evolved into a statewide charity dedicated to the welfare of children." (Stipulation of Undisputed Facts ¶16.)

[5] Section 3126(a)(8) of the Crimes Code states:

> A person is guilty of indecent assault if the person has indecent contact with the complainant, causes the complainant to have indecent contact with the person or intentionally causes the complainant to come into contact with seminal fluid, urine or feces for the purpose of arousing sexual desire in the person or the complainant and:

**(Footnote continued on next page…)**

§3123(a)(7)[6] for acts he committed between July 2005 and December 2008. Following his convictions, he and his wife received separate letters from SERS indicating that Mr. Sandusky's entire retirement benefit and Mrs. Sandusky's derivative benefit were forfeited as of October 9, 2012, as per Section 3(a) of the Pension Forfeiture Act.[7] Specifically, the letter advised that because Mr. Sandusky was "an actual or *de facto* employee of the Pennsylvania State University (PSU) from July 1, 1999, through at least December 31, 2008," including the time at which the acts underlying his convictions occurred, and because his public employment placed him in a position to commit those acts which are enumerated as "crimes related to

---

**(continued…)**

\* \* \*

> (8) the complainant is less than 16 years of age and the person is four or more years older than the complainant and the complainant and the person are not married to each other.

18 Pa. C.S. §3126(a)(8).

[6] Section 3123(a)(7) of the Crimes Code provides that "[a] person commits a felony of the first degree when the person engages in deviate sexual intercourse with a complainant… (7) who is less than 16 years of age and the person is four or more years older than the complainant and the complainant and person are not married to each other." 18 Pa. C.S. §3123(a)(7).

[7] Section 3(a) of the Pension Forfeiture Act states:

> Notwithstanding any other provision of law, no public official or public employee nor any beneficiary designated by such public official or public employee shall be entitled to receive any retirement or other benefit or payment of any kind except a return of the contribution paid into any pension fund without interest, if such public official or public employee is convicted or pleads guilty or no defense to any crime related to public office or public employment.

43 P.S. §1313(a).

public office or public employment," his pension was subject to forfeiture. (R.R. at 3a.)

The Pension Forfeiture Act was enacted on July 8, 1978, and provides for the forfeiture of the pensions of "public employees"[8] and their beneficiaries upon conviction of "any crime related to public office or public employment." Section 3(a) of the Pension Forfeiture Act, 43 P.S. §1313(a). As initially enacted, the disqualifying crimes consisted of a variety of criminal offenses under Title 18 of the Crimes Code but did not include sexual offenses against children. *See* Section 2 of the Pension Forfeiture Act, 43 P.S. §1312, *as amended* by the Act of July 15, 2004, P.L. 733. However, effective September 13, 2004, Section 2 of the Pension Forfeiture Act redefined the crimes covered to include "any of the criminal offenses

---

[8] Section 2 of the Pension Forfeiture Act defines a "public official" or "public employee" as:

> Any person who is elected or appointed to any public office or employment including justices, judges and justices of the peace and members of the General Assembly or who is acting or who has acted in behalf of the Commonwealth or a political subdivision or any agency thereof including but not limited to any person who has so acted and is otherwise entitled to or is receiving retirement benefits whether that person is acting on a permanent or temporary basis and whether or not compensated on a full or part-time basis. This term shall not include independent contractors nor their employees or agents under contract to the Commonwealth or political subdivision nor shall it apply to any person performing tasks over which the Commonwealth or political subdivision has no legal right of control. However, this term shall include all persons who are members of any retirement system funded in whole or in part by the Commonwealth or any political subdivision. For the purposes of this act such persons are deemed to be engaged in public employment.

43 P.S. §1312.

5

set forth in Subchapter B of Chapter 31 (relating to definition of offenses) when the criminal offense is committed by a school employee as defined in 24 Pa. C.S. §8102 (relating to definitions against a student)." Section 2 of the Pension Forfeiture Act, 43 P.S. §1312. The amended definition includes 18 Pa. C.S. §3126(a)(8) and 18 Pa. C.S. §3123(a)(7), under which Mr. Sandusky was convicted for crimes committed after September 13, 2004.

After receiving SERS' correspondence, PSU's counsel advised SERS that it "cannot agree that there is a factual basis that would allow Mr. Sandusky to be considered a *de facto* employee following his retirement." (R.R. at 12a.) With regard to compensation paid to Mr. Sandusky after 1999, PSU reported the following payments as per Form 1099s issued to Mr. Sandusky: $1,500.00 in 2007 for speaking at a "Leader Space Conference" in the HUB Center; $1,657.50 in 2000 for participating in a coaches' clinic held at the Behrend campus; and $1,200.00 in 2006 for a presentation at a "Rising Above Challenges" conference. (*Id.* at 12a−13a.) With respect to a request SERS made for information regarding tickets distributed to Mr. Sandusky, PSU stated, "[T]he University does not view the provision of tickets to create a *de facto* employment relationship with the tickets' recipients. Football tickets are frequently provided to persons having some association with the University and alumni." (*Id.* at 13a.)

Mr. Sandusky appealed to SERS, contending that application of the amended Pension Forfeiture Act to him unconstitutionally impaired his contract rights under Article I, Section 10 of the United States Constitution[9] and Article I,

---

[9] *See* U.S. Const. art. I, §10 ("No State shall enter into any Treaty, Alliance, or Confederation; grant Letters of Marque and Reprisal; coin Money; emit Bills of Credit; make any **(Footnote continued on next page…)**

Section 17 of the Pennsylvania Constitution[10] because his retirement benefits vested in 1969 when he elected to become a member of SERS. Regardless, he argued that he did not qualify as a "school employee" when he committed the acts that led to forfeiture of his benefits because he received no remuneration from PSU after his 1999 retirement but received only a severance payment and fringe benefits. To the extent that he fulfilled speaking engagements at PSU, Mr. Sandusky asserted that he was an independent contractor rather than a PSU employee.

## II.

An administrative hearing[11] was held before Hearing Officer Michael Bangs, at which Mr. Sandusky testified that he remained an assistant football coach at PSU through 1999, turning down numerous lucrative offers to serve as head coach at other universities making more money. He stated that around 1998, he learned that he would not have an opportunity to become PSU's head coach and subsequently began exploring other career options, including retirement. At that time, a retirement incentive was available whereby state employees who retired in 1999 were credited with five additional years of service, which he viewed as an opportunity to increase his financial security. Consequently, he resolved to become a full-time consultant for

---

**(continued…)**

Thing but gold and silver Coin a Tender in Payment of Debts; pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts, or grant any Title of Nobility.").

[10] *See* Pa. Const. art. I, §17 ("No *ex post facto* law, nor any law impairing the obligation of contracts, or making irrevocable any grant of special privileges or immunities, shall be passed.").

[11] Prior to the hearing, the Sanduskys filed a motion *in limine* to preclude certain evidence, which the Hearing Officer granted in large part on the bases of relevancy and hearsay. Subsequently, the Board reversed many of the Hearing Officer's evidentiary rulings, but because these issues are not currently before us, we will not set them forth at length.

7

The Second Mile and commenced retirement negotiations with Tim Curley, PSU's Director of Athletics. During the negotiation process, Mr. Sandusky conveyed to Athletic Director Curley his concern that PSU might not continue collaborating with The Second Mile after his retirement, even though The Second Mile "earned that right… with the [TIPS and Peak] [P]rograms that [it] developed" because his association initially facilitated the joint efforts. (R.R. at 252a.)

The negotiations culminated in the execution of an agreement entitled, "Retirement Perquisites" (Agreement), enumerating the following terms and conditions:

In accordance with our discussion regarding your retirement from University service effective June 29, 1999, and in recognition of your many contributions to the University and its Intercollegiate Athletics Program during the tenure of your employment, I am pleased to confirm the following perquisites to be extended to you upon and after your retirement on June 29, 1999:

1. The University will pay you the amount of One Hundred Sixty-eight Thousand and 00/100 ($168,000.00) Dollars in lump sum, less applicable withholdings as required by law, on or before July 31, 1999.

2. The University will give you four (4) complimentary football season tickets in your current location, and in addition, you will be given the option to purchase four (4) more football season tickets within the thirty-five yard lines and below the walkway. This benefit will continue for the balance of your lifetime.

3. The University will give you two (2) complimentary men's basketball season tickets and two (2) complimentary women's basketball season tickets. The location of these tickets will be within the normal Football

8

Staff ticket location. This benefit will continue for the balance of your lifetime.

4. The University will permit you to use at no charge, a locker, weight rooms, fitness facilities and training room in the East Area locker room complex. This benefit will continue for the balance of your lifetime.

5. For a period of five (5) years commencing July 1, 1999, and subject to renewal upon concurrence of both parties, you and the University agree to work collaboratively with each other in the future in community outreach programs, such as [T]he Second Mile, and other programs which provide positive visibility to the University's Intercollegiate Athletics Program. It is understood that the nature and extent of such collaborative efforts, which will include continuation of the Nittany Lion TIPS and PEAK Programs and occasional recognition of [T]he Second Mile in the Beaver Stadium Pictorial and the Penn State Football Story Show, will be as mutually agreed by you and [Timothy M. Curley].

6. For a period of ten (10) years, commencing July 1, 1999, and subject to renewal upon concurrence of both parties, you will be given an office and a phone in the East Area locker room complex for purposes of the collaborative arrangements references in no. 5 above.

(*Id.* at 385a–386a.) The Agreement was signed by Mr. Sandusky as well as Athletic Director Curley and Gary O. Schultz, PSU's Senior Vice President for Finance and Business/Treasurer.

With regard to the $168,000.00 payment, Mr. Sandusky testified that PSU provided this sum "to reward [him] for [his services]" to PSU and to compensate him for the more lucrative, financial opportunities he turned down in order to remain a coach at PSU. (*Id.* at 243a.) He believed that other retired coaches received similar, complimentary football tickets but was uncertain with regard to basketball

tickets. He also testified that retirees of emeritus rank,[12] such as himself, were granted access to the training rooms and were permitted to maintain offices at PSU. He explained that paragraph 6 of the Agreement enabled him "to take [his] information that still was relevant to [him] from coaching and file it in an office and be able to receive and answer phone calls that [he] would receive from coaches, from people interested in learning about football, learning about [The] Second Mile, whatever it might be." (*Id.* at 246a.)

As far as paragraph 5 of the Agreement referenced collaborative efforts, Mr. Sandusky testified that he never had occasion to discuss such efforts with Athletic Director Curley because the two programs—Nittany Lion TIPS and PEAK Programs—were already in place and any changes to them would have been implemented through The Second Mile staff rather than Mr. Sandusky.

According to Mr. Sandusky, despite the fact that he signed the Agreement on June 29, 1999, he was not interested in retiring prior to the end of the 1999 football season. To accommodate him and provide for its own needs as its football team prepared to participate in the Alamo Bowl, PSU executed the Agreement but rehired him immediately on an emergent basis, thereby allowing him

---

[12] As per an internal memorandum, PSU granted a request to appoint Mr. Sandusky as "Assistant Professor Emeritus of Physical Education/Assistant Coach" on August 31, 1999, in recognition of his "commitment and contributions to the University during the past 30 years." (R.R. at 400a.) Pursuant to PSU policy, recipients of emeritus rank receive privileges in addition to those generally enjoyed by retirees, including but not limited to, access to PSU's recreational facilities. (*Id.* at 401a.) Additionally, "Office or laboratory space will be assigned as appropriate to an emeritus faculty member by the home academic department or college in accordance with space available, the emeritus faculty member's productivity and contributions to the teaching and research programs, and policies of the individual units regarding space assignments." *Id.*

to complete the 1999 football season and remain employed through June 30, 2000. Three days after his period of emergency hire ended, Mr. Sandusky explained that he assumed a consulting role with The Second Mile, having "no official capacity at Penn State," "retir[ing] completely with Penn State," and never engaging in collaborative efforts with PSU regarding outreach programs. (*Id.* at 251a.) In his expanded role with The Second Mile, Mr. Sandusky engaged in fundraising, served as the Chairman of the Strategic Planning Committee to develop new ideas, recruited a campaign committee and chaired that committee, attended board meetings throughout the Commonwealth, and fulfilled various speaking engagements.

Further, through his company Sandusky & Associates, Inc., Mr. Sandusky began to organize football camps for which he rented the facilities at Albright College, Delaware Valley College, Penn State branch campuses, West Chester University, Muhlenberg College and Robert Morris College, actually paying one of the highest rental rates to PSU. Mr. Sandusky explained that PSU never compensated him for conducting any of the football camps.

He did agree that PSU compensated him for fulfilling three speaking engagements in his capacity as a consultant for The Second Mile, but denied holding himself out as a PSU employee, possessing or using PSU business cards, or receiving paychecks or W-2 forms from PSU after the end of the 1999 football season. Moreover, he stated that to the best of his knowledge, PSU did not consider him an employee after 1999 and, in fact, threw him a retirement party after the end of the 1999 season.

On cross-examination, Mr. Sandusky explained that he was granted tenure around 1979 after he was promoted to assistant professor and defensive coordinator. During his service on the coaching staff, PSU was highly successful, attending 29 bowl games. He stated that as a result of his successful coaching, he was fairly well-known both within and outside of PSU, and consequently interacted with donors on behalf of PSU, acting in his official capacity as a PSU ambassador, but explained that he served a dual role as a representative of The Second Mile and admitted negotiating his post-1999 retirement plans with an eye toward maintaining a long-term relationship with PSU. After his 1999 retirement, he dedicated more time to The Second Mile because, for the first time, he was paid to do so.

He further detailed his unique retirement situation, explaining that by 1999, he had achieved 30 years of service with PSU and attained the age of 55 years old. Upon learning that he would not be named PSU's next head coach, he began exploring opportunities to remain employed with PSU in other capacities but ultimately opted to retire. Initially, he requested a $20,000.00 annual annuity to protect his wife, a title to reflect his relationship with PSU, the option to purchase football tickets for fundraising, access to PSU's training and workout facilities, the opportunity to run a football camp at PSU for middle-school youth, and other mechanisms to maintain his visibility in the community. His negotiations with Athletic Director Curley over these requests resulted in the 1999 Agreement under which PSU provided him the $168,000.00 lump sum payment.

Mr. Sandusky also explained that the Nittany Lions TIPS Program was developed by The Second Mile staff and featured trading cards with photographs of

PSU athletes and inspirational messages.[13]   Similarly, the Peak Program was developed through The Second Mile and was geared toward prevention, education and awareness for children.

He recalled that although the Agreement provided for a review after five years, that review was never performed and the status quo continued.  Specifically, the TIPS Program continued throughout the initial five-year period and beyond, until 2010.  Mr. Sandusky retained office space until 2007 or 2008 when he voluntarily allowed PSU to make other use of it.  Likewise, Mr. Sandusky's other benefits under the Agreement continued beyond the initial five-year period, exceeding the 2004 termination date.

For example, beginning in 2006 or 2007, the Sanduskys attended football games in the Intercollegiate Athletic (ICA) Department box, which The Nittany Lion Club used to raise money for the ICA Department by providing current

---

[13] The Nittany Lion TIPS Program is described as follows:

> Developed by The Second Mile as a service for counselors and principals, Nittany Lion TIPS are cards featuring Penn State players on the cards' fronts and educational and motivational messages from the players on the cards' backs.  In the past, counselors and principals have chosen to use TIPS to reinforce behavior, to reward changed behavior, to prompt discussion about a particular concern, and to "break the ice" with new clients.  Typically, students have been given the opportunity to earn one card at a time until they receive an entire set.  In past years, counselors have consistently rated the cards "effective" to "highly effective" in working with students.

(R.R. at 458a.)

and prospective donors access to former football players and coaches. Nonetheless, he clarified, "I didn't feel that it was my job at all to do any fundraising for Penn State University or The Second Mile from [the box]. I went there to observe—to enjoy the football game and to be with family and friends." (*Id.* at 328a.) He did not dispute that PSU's ICA Department and its football program supported The Second Mile, but stated that PSU had minimal involvement in controlling the TIPS cards' logo and their use. PSU also allowed The Second Mile to rent its golf course for fundraising functions and featured former football players as celebrities.

Mr. Sandusky conceded that he had contact with Victim 1, a student at Central Mountain High School and a participant in The Second Mile, while he was a volunteer coach at the high school in 2007–2008. He did not dispute that the crimes for which he was convicted with regard to Victims 1 and 9 occurred on or were committed after September 13, 2004, or that his public employment placed him in a position to commit those acts.

In opposition to the Sanduskys' appeal, SERS presented the testimony of Susan C. Hostetter, a SERS employee, who prepared a chronology of the pertinent events. Specifically, she confirmed Mr. Sandusky's employment history at PSU, stating that he was promoted to assistant professor on July 1, 1975, and became tenured effective July 1, 1980. On June 29, 1999, his employment was terminated and his SERS account was credited with 30.3533 years of service. He was rehired on an emergency basis for 95 days from July 15, 1999, through June 30, 2000. With regard to Mr. Sandusky's convictions, Ms. Hostetter testified, "These are criminal offences listed in Chapter 31 of Title 18 of the Pennsylvania Consolidated Statutes and were committed after September 13th, 2004, the effective date of Act 2004-86,

14

which amended the Pennsylvania Public Employee Pension Forfeiture Act." (*Id.* at 339a.)

Although upon SERS' request, subpoenas directed to Athletic Director Curley and Senior Vice President Schultz to attend and testify were issued by the Hearing Officer and served, both elected not to appear. Further, although counsel for all parties agreed to propound written questions upon Athletic Director Curley and Senior Vice President Schultz, they declined to answer any of the questions pursuant to their Fifth Amendment right to remain silent.

## III.

Following the hearing, Hearing Officer Bangs rendered an opinion, recommending that Mr. Sandusky's request to reinstate his pension from October 9, 2012 forward be granted. He rejected Mr. Sandusky's constitutional claims but interpreted the statutory provisions of the Pension Forfeiture Act as non-applicable to Mr. Sandusky, noting that although the pre-2004 version applied to Mr. Sandusky because he was promoted several times throughout his career at PSU, including after enactment of the legislation, he did not satisfy the statutory definition of a "school employee"[14] at the time he committed the relevant crimes. Specifically, the Hearing

---

[14] Section 8102 of the Public School Employees' Retirement Code defines a "[s]chool employee" as:

> Any person engaged in work relating to a public school for any governmental entity *and for which work he is receiving regular remuneration* as an officer, administrator or employee excluding, however, any independent contractor or a person compensated on a fee basis.

24 Pa. C.S. §8102 (emphasis added).

15

Officer explained that Mr. Sandusky did not receive regular remuneration after his 1999 retirement since his tax records and PSU's records revealed no more than six post-1999 payments to Mr. Sandusky.

He also rejected SERS' argument that Mr. Sandusky was a *de facto* employee, applying the ten-factor test articulated in *Zimmerman v. Public School Employees' Retirement Board*, 522 A.2d 43, 45 (Pa. 1987)[15] to determine whether an employee-employer relationship existed. With regard to the first factor, the Hearing Officer noted that after 1999, Mr. Sandusky controlled the manner in which he worked, came and went as he pleased, was not accountable to anyone at PSU, did not have any responsibility to PSU, and maintained a relationship with PSU only in furtherance of the goals of The Second Mile of which he was a full-time employee.

The Hearing Officer explained that the only post-1999 term or agreement between the parties was the Retirement Perquisites Agreement, which he interpreted as an agreement "to work together for the sake of charity, which will also provide positive 'visibility' to the Penn State Athletics Program," without specific terms governing. (R.R. at 374a.) He further repudiated SERS' "very tenuous

---

[15] The test requires consideration of the following factors:

> Control of manner work is to be done; responsibility for result only; terms of agreement between the parties; the nature of the work or occupation; skill required for performance; whether one is engaged in a distinct occupation or business; which party supplied the tools; whether payment is by the time or by the job; whether work is part of the regular business of the employer, and also the right to terminate the employment at any time.

*Zimmerman v. Public School Employes' Retirement Board*, 522 A.2d 43, 45 (Pa. 1987).

argument" that Mr. Sandusky renewed the 1999 Agreement for an additional five years, finding "absolutely no evidence to support this claim." (*Id.* at 375a.)

With respect to factors four through six, the Hearing Officer noted that while the exact nature of the work Mr. Sandusky performed was unclear, the Agreement "had nothing to do with the skills [Mr. Sandusky] had previously used as a football defensive coordinator with Penn State," especially in light of the fact that after 1999, Mr. Sandusky's relationship with PSU existed only insofar as The Second Mile was concerned. (*Id.*) In terms of which party provided the tools, the Hearing Officer found split evidence, noting that PSU provided Mr. Sandusky an office and use of the athletic facilities, but that "the proliferation of evidence provided indicates that he did a significant amount of his work with other employees of The Second Mile" and regardless, that use of PSU facilities did not advance the relationship between PSU and The Second Mile but was merely for Mr. Sandusky's personal use. (*Id.*) In determining whether Mr. Sandusky received payment based on time or based on job, Hearing Officer Bangs reasoned that between 2000 and 2008, PSU made only six payments to Mr. Sandusky which totaled less than $5,000.00.

Regarding the ninth factor, the Hearing Officer determined that while maintaining PSU's reputation may be important to it, an initiative to foster relationships with charitable organizations "cannot be said to be part of its 'regular business.'" (*Id*. at 376a.) Finally, pursuant to the last factor, the Hearing Officer found no evidence that a failure to "work collaboratively" with PSU for the five-year period would give rise to a negative implication and, therefore, that "either party could terminate the 'relationship' at any time." (*Id.* at 375a–376a.) As such, the Hearing Officer concluded that Mr. Sandusky was not a school employee on or after

17

September 13, 2004, the date on which the sexual offenses capable of triggering forfeiture were added to the enumerated list of crimes in the Pension Forfeiture Act.

SERS filed exceptions, and the Board issued an order rejecting the Hearing Officer's recommendation and affirming the decision of SERS to enforce forfeiture of the pension benefits on the basis that Mr. Sandusky was an employee of PSU after the Pension Forfeiture Act was amended as per the Agreement which constituted a binding, enforceable employment contract, and pursuant to which Mr. Sandusky received regular remuneration.[16] Specifically, the Board examined the definition of "regular remuneration" under the Retirement Code, 24 Pa. C.S. §8102, finding that it "must include a larger panoply of payments and consideration (either in kind, or traditional fringe benefits, or other rights and attributes of employment)." (12/18/14 Board Opinion, at 32.)

The Board acknowledged that PSU's Athletic Department controlled access to the ICA Department suite and distributed tickets to home football games, largely for the purpose of soliciting donations from current and former donors who were willing to pay to interact with former football coaches and coaches of other PSU sports teams. The Board also recognized that Mr. Sandusky:

> was granted an office and telephone by virtue of his emeritus status and that this was similar to what other Penn State employees received when they were granted emeritus status. The Penn State Policy HR-25 Emeritus Rank…states that office or laboratory space will be assigned as appropriate to an emeritus faculty member

---

[16] Like the Hearing Officer, the Board rejected the Sanduskys' constitutional claims.

according to several criteria including availability and productivity. Additionally, an emeritus faculty member had a Penn State Access Account for Internet services. Providing a telephone along with computer access is a normal ancillary to furnishing a productive and functional office space.

(*Id.* at 63.)

Nonetheless, the Board determined that PSU provided Mr. Sandusky regular remuneration in the form of the $168,000.00 lump-sum payment, office space, tickets for athletic events and access to PSU facilities as payment for his continued employment with PSU beyond 1999:

> Pursuant to the Letter Agreement, [Mr. Sandusky] did work collaboratively with Penn State to promote Penn State's image after 1999. The Letter Agreement had an initial term of five years and necessarily was renewed thereafter because [Mr. Sandusky] continued to work collaboratively with Penn State at least until 2009. Among other things, [Mr. Sandusky] directed and personally participated in the TIPS Program, through which The Second Mile distributed trading cards containing Penn State's logo, and pictures of Penn State athletes, as well as inspirational messages. Hundreds of thousands of these cards were distributed to students in Penn State's target market, Central Pennsylvania. Penn State received "positive visibility" through marketing this program.

> The close ties between Penn State and The Second Mile enhanced Penn State's image. The Second Mile and Penn State enjoyed a symbiotic relationship, in which The Second Mile benefited from increased donations and recognition as a result of its association with Penn State, and Penn State benefited by enhancing the reputation of the University and its athletic program through its close alliance with a well-respected charity. [Mr. Sandusky] even admitted at the January 7, 2014 [ ] hearing in this matter

19

that The Second Mile would not have flourished without its close relationship with Penn State. [Mr. Sandusky] personally was the bridge between Penn State and The Second Mile, both before and after 1999. This is precisely what the Letter Agreement envisioned when it called for [Mr. Sandusky] and Penn State to "work collaboratively…to provide positive visibility to the University's Intercollegiate Athletics Program."

In addition, pursuant to the Letter Agreement, [Mr. Sandusky] did other work that benefited Penn State's reputation. He attended football games in the Athletic Department's Development suite, and interacted with donors there. Timothy Curley, Penn State's Director of Intercollegiate Athletics ("Curley"), expressly directed Penn State's development staff to provide [Mr. Sandusky] and his wife with tickets to this suite throughout the 2000s. [Mr. Sandusky] and The Second Mile hosted gold tournaments at Penn State's golf courses, which featured former Penn State players. Penn State's athletic development staff attended these tournaments, at the express direction of Curley, as the tournaments were filled with Penn State donors.

The Letter Agreement puts the lie to [Mr. Sandusky]'s contention that he "retired" in 1999. In June 1999, [Mr. Sandusky] retired from his position as a football coach, but then continued as a Penn State employee in a new "outreach" position, as [Mr. Sandusky] described it when he was negotiating the Letter Agreement with Penn State.

Prior to the 1999 football season, [Mr. Sandusky] was informed that he would never be the head football coach at Penn State, and he decided that he wanted to leave his coaching position. [Mr. Sandusky] admitted under oath, however, that he had no intention of leaving before the 1999 season, when Penn State was expected to contend for a national championship. [Mr. Sandusky] and Timothy Curley, Penn State's Athletic Director, began negotiating the terms on which [Mr. Sandusky] would retire as a coach, but would continue in a "long-term relationship with the University." R-172. While [Mr. Sandusky] and Curley were negotiating, an SERS retirement incentive window existed for employees who retired before July 1, 1999, to

20

receive enhanced pension benefits. [Mr. Sandusky] and Curley agreed that [Mr. Sandusky] would "retire" as a coach, but then would be immediately rehired as an "emergency hire" to coach the 1999 season. Overlaying this bridge employment as an emergency-return-to-service annuitant, [Mr. Sandusky] also contracted to be an outreach employee under the Letter Agreement.

It is the presence of the Letter Agreement that makes this case unique, and that together with the other unique facts and circumstances, proves [Mr. Sandusky]'s status as a school employee. In the Letter Agreement, [Mr. Sandusky] and Penn State agreed in writing that Penn State would continue to provide [Mr. Sandusky] with valuable consideration in the form of, *inter alia*, cash, tickets, office space, and access after he retired as a coach. In exchange, [Mr. Sandusky] would work to promote the University. Penn State gave [Mr. Sandusky] the tools to do this job – such things as an office, access to Penn State's logo and player images for the TIPS program, and football tickets. Penn State could have taken those away at any time. The Letter Agreement documents the existence of an employment relationship between Penn State and [Mr. Sandusky] that continued after June 30, 1999. Therefore, [Mr. Sandusky]'s crimes were those of a "school employee" under the Forfeiture Act.

(*Id.* at 35–37.) The instant appeal followed.[17]

---

[17] Our scope of review is limited to determining whether constitutional rights were violated, whether the adjudication is not in accordance with the law, whether local agency procedures have been violated, or whether "any findings of fact made by the agency and necessary to support its adjudication are not supported by substantial evidence." *Drennan v. City of Philadelphia, Board of Pensions & Retirement*, 525 A.2d 1265, 1266 (Pa. Cmwlth. 1987); *see* Section 754(b) of the Local Agency Law, 2 Pa. C.S. §754(b).

21

## IV.

On appeal, the Sanduskys first contend that substantial evidence does not support the Board's finding that Mr. Sandusky was a "school employee" on or after September 13, 2004, such that his convictions trigger forfeiture of his pension benefits. Because we find that the consideration PSU provided Mr. Sandusky in exchange for his agreement to retire was neither "remuneration" for continued services to PSU nor "regular," we agree.

## A.

We begin by analyzing the Retirement Code from which SERS and the Board derive their authority. As discussed above, the Retirement Code defines a "school employee" as "any person engaged in work relating to a public school for any governmental entity and for which work he is receiving regular remuneration as an officer, administrator or employee excluding, however, any independent contractor or a person compensated on a fee basis." 24 Pa. C.S. §8102. Unfortunately, it does not define the term "remuneration" or "regular remuneration." *See* 24 Pa. C.S. §8102.

"Remuneration" appears twice in the Retirement Code. First, "regular remuneration" must be provided by a public school to its employee in order for the employee to qualify as a "school employee" under 24 Pa. C.S. §8102. Second, "remuneration" appears in the definition of "compensation," which is used to calculate SERS' members' benefits upon their retirement:

> Pickup contributions plus any remuneration received as a school employee *excluding reimbursements for expenses incidental to employment and excluding any bonus, severance payments, any other remuneration or other emolument received by a school employee during his school*

22

*service which is not based on the standard salary schedule under which he is rendering service,* payments for unused sick leave or vacation leave, bonuses or other compensation for attending school seminars and conventions, payments under health and welfare plans based on hours of employment or any other payment or emolument which may be provided for in a collective bargaining agreement which may be determined by the Public School Employees' Retirement Board to be for the purpose of enhancing compensation as a factor in the determination of final average salary, and excluding payments for military leave and any other payments made by an employer while on USERRA leave, leave of absence granted under 51 Pa. C.S. §4102 (relating to leaves of absence for certain government employees), military leave of absence granted under 51 Pa. C.S. §7302 (relating to granting military leaves of absence), leave granted under section 1178 of the act of March 10, 1949 (P.L. 30, No. 14), known as the Public School Code of 1949, or other types of military leave, including other types of leave payments, stipends, differential wage payments as defined in IRC §414(u)(12) and any other payments, provided, however, that the limitation under section 401(a)(17) of the Internal Revenue Code of 1986 (Public Law 99-514, 26 U.S.C. §401(a)(17)) taken into account for the purpose of member contributions, including regular or joint coverage member contributions, regardless of class of service, shall apply to each member who first became a member of the Public School Employees' Retirement System on or after July 1, 1996, and who by reason of such fact is a noneligible member subject to the application of the provisions of section 8325.1 (relating to annual compensation limit under IRC §401(a)(17)).

24 Pa. C.S. §8102 (emphasis added).

The Retirement Code provides a restrictive definition of "compensation," seeking to "preserve the actuarial integrity of the retirement fund by exclud[ing] from the computation of employes' final average salary all payments which may artificially inflate compensation for the purposes of enhancing retirement

benefits." *Christiana v. Public School Employees' Retirement Board*, 669 A.2d 940, 944 (Pa. 1996) (internal quotation marks omitted) (alterations in original). Based on this objective, the Board concluded that the definition of "regular remuneration" as included in the meaning of "school employee" was necessarily broader than the definition of "remuneration" included within the meaning of "compensation." While we need not decide this precise question, it is significant that "remuneration" is qualified by the word "regular" in the definition of "school employee" but is not so restricted in the definition of "compensation," a fact which the Board apparently did not consider.

### 1. $168,000.00 Lump-Sum Payment

In *Christiana*, the superintendent of a school district challenged the Board's exclusion of certain annuities he purchased from the calculation of his final compensation for retirement purposes. 646 A.2d 645, 649 (Pa. Cmwlth. 1994) (*en banc*), *aff'd*, 669 A.2d 940 (Pa. 1996). In affirming the Board's determination, we explained:

> standard salary and regular remuneration are defined by the Board as take-home cash, *including,* among others, (i) amounts withheld for tax remittances; (ii) amounts picked up as contributions to PSERS; and (iii) amounts appropriately deferred in qualifying deferred compensation programs, and *excluding,* fringe benefits, bonuses, severance payments, and *non-salary reduction Internal Revenue Code § 403(b) tax sheltered annuities.*

*Id.* at 649–50 (emphasis in original). Insofar as the superintendent received a severance payment, we agreed that it constituted "non-standard salary, non-regular

remuneration" and, therefore, excluded it from the calculation of his compensation. *Id.* at 650.

On appeal, the Supreme Court stated, "The Board has developed the concepts of 'standard salary' and 'regular remuneration' as part of its understanding of compensation," and cited the definition set forth by our Court with approval. *Christiana*, 669 A.2d 940, 945 (Pa. 1996). Thus, although "regular remuneration" is distinct from "compensation," the two definitions both exclude severance payments—the first, because severance payments are not "regular" payments provided for services rendered and the latter because its statutory definition expressly excludes them.[18]

The Retirement Code defines severance payments as "any payments for unused vacation or sick leave and any additional compensation contingent upon retirement including payments in excess of the scheduled or customary salaries provided for members within the same governmental entity with the same educational and experience qualifications who are not terminating service." 24 Pa. C.S. §8102.[19] We further refined this definition in *Dowler v. Public School Employes' Retirement Board*, explaining, "under the [Retirement] Code, all payments, other than for regular

---

[18] Excluding severance payments also comports with the plain language and common meaning of the phrase "regular remuneration." *See* Merriam-Webster's Collegiate Dictionary 1048-49 (11th ed. 2004) (defining "regular" as "normal, standard… conforming to the normal or usual manner or inflection"); Black's Law Dictionary 1322 (8th ed. 2004) (defining "remuneration" as "1. Payment; compensation. 2. The act of paying or compensating.").

[19] Whether a particular payment constitutes a "severance payment" is a question of law. *Dowler v. Public School Employes' Retirement Board*, 620 A.2d 639, 643 (Pa. Cmwlth. 1993).

25

professional salary, which are part of an agreement in which a professional member agrees to terminate school service by a date certain, are prima facie severance payments." 620 A.2d 639, 643 (Pa. Cmwlth. 1993). To rebut a *prima facie* showing that the payment is a severance payment, one must "show[ ] that the payment is in accord with the [employer's] scheduled or customary salary scale … for personnel with the same educational and experience qualifications who are not terminating service." *Id.* In that case, we affirmed the Board's finding that a payment constituted a severance payment due to the fact that it was paid pursuant to a written agreement which "demonstrate[d] the parties' intention to pay a sum of money, not a part of the claimant's regular salary, upon the claimant's agreeing to retire by July 1, 1988." *Id.* at 643.

Similarly, at issue in *Christiana* was a resolution adopted by the school board after it learned that its then-superintendent intended to retire, which provided in pertinent part:

> [t]hat the District shall provide the Superintendent with an annuity or other equivalent payment at a cost to the District of $19,200 for purposes of purchasing for the Superintendent pension credit under the State Retirement Plan for service as an educator in positions prior to his employment under the Pennsylvania retirement system, as permitted by the laws of Pennsylvania….

669 A.2d at 941. On appeal, the Supreme Court affirmed our finding that the $19,200.00 annuity purchase the school district made after being advised of the superintendent's impending retirement was part of a severance package because substantial evidence supported the determination that "the annuity payments were remuneration that was not based on the standard salary schedule for which [the

superintendent] was rendering service, and that the $19,200 payment was a severance payment." *Id.* at 946.

Under the test set forth in *Dowler*, the $168,000.00 lump-sum payment to Mr. Sandusky is a *prima facie* severance payment and, therefore, by definition, excluded from "regular remuneration." Indeed, the record established that the payment was provided to him only pursuant to the Retirement Perquisites Agreement and not as part of his "regular professional salary." There is no evidence indicating that he received such payments in the past, and by the terms of the Agreement, the lump-sum payment was a single, unscheduled, one-time benefit that was not in any way "regular." Likewise, there was no evidence presented that other similarly-situated employees who were not retiring received such a benefit.

Further, as per the face of the Agreement, Mr. Sandusky's retirement on June 29, 1999, was a condition precedent to his receipt of the lump sum, as the Agreement provided:

> I am pleased to confirm the following perquisites to be extended to you upon and after your retirement on June 29, 1999: The University will pay you the amount of One Hundred Sixty-eight Thousand and 00/100 ($168,000.00) Dollars in lump sum, less applicable withholdings as required by law, on or before July 31, 1999.

(R.R. at 385a.)

The fact that Mr. Sandusky was rehired on an emergency basis for 95 days pursuant to the legal authority in 71 Pa. C.S. §5706 (a.1) and, in fact, wanted to

27

be temporarily rehired, does not in and of itself convert his retirement into a "sham." In other words, the critical inquiry in determining whether the Agreement required Mr. Sandusky to retire in 1999 is not whether he subsequently engaged in emergent employment for 95 days, but rather, whether he continued an employee-employer relationship with PSU beyond the emergency period. Because the lump sum was paid pursuant to the Agreement which facially demonstrated Mr. Sandusky's and PSU's intent that Mr. Sandusky receive a sum of money not part of his regular salary upon his agreement to retire by July 31, 1999, prima facie evidence of a severance payment exists. *Dowler*, 620 A.2d at 643. Although the Board argues that the lump sum was not a severance payment but rather a cash advance for future services rendered *ad infinitum*, no evidence has been offered in rebuttal that a $168,000.00 lump sum, advance payment is the customary salary PSU affords to employees who offer outreach services (or any services, for that matter) on its behalf.[20] As such, we find as a matter of law that the $168,000.00 payment constituted a severance payment rather than "regular remuneration."

### 2. Office Space, Access to Athletic Facilities, and Tickets to Athletic Events

The Board also determined that Mr. Sandusky received other forms of "regular remuneration" in addition to the lump-sum payment. Specifically, it determined that "valuable consideration" was provided to Mr. Sandusky in the form

---

[20] Although the Board did not determine the exact date on which Mr. Sandusky's employment terminated, it found that he was employed with PSU until at least 2008 or 2009. Thus, Mr. Sandusky would have been paid about $14,222.00 to $16,800.00 per year for his services if the $168,000.00 were, in fact, advance payment. Of course, had he not faced criminal prosecution, his purported employment may have continued longer, even further diminishing the annual average of his "remuneration" under the Agreement.

of tickets, office space and access to PSU facilities and concluded that because Mr. Sandusky "was receiving consideration from Penn State," he was a PSU employee under the Retirement Code. (12/18/14 Board Decision, at 35, 41.)

First, we disagree with the Board's attempt to equate "regular remuneration" with "valuable consideration." Although "regular remuneration" necessarily encompasses the provision of valuable consideration in exchange for services rendered, not all "valuable consideration" is remuneration *regularly* provided. Such an interpretation effectively reads the word "regular" out of the phrase "regular remuneration."

Moreover, while it is undisputed that Mr. Sandusky received these perks, his access to PSU facilities and the office space he was provided are not at all unprecedented and indeed are consistent with his undisputed status as a professor emeritus as the Board recognized. As per PSU's Policy HR-25 governing "Emeritus Rank," emeritus professors generally enjoy access to PSU's recreational facilities as well as office space on an as-available basis. Consistent with Policy HR-25, Mr. Sandusky had access to an office until 2007 or 2008 when the space was needed for another individual. The fact that Mr. Sandusky was afforded office space and access to PSU facilities does not lend credence to the Board's conclusion that Mr. Sandusky received regular remuneration after 1999.

Finally, with regard to the football tickets the Sanduskys received, the only evidence of record indicates that such tickets were regularly provided to former football coaches for purposes of eliciting donations from alumni and other donors whose donations afforded them an opportunity to interact with the coaches in the ICA

Department suite. Indeed, the Board's own findings of fact indicate that former football coaches were regularly present in the ICA Department suite, which was a "major development tool for the Penn State Athletic Department." (*Id.* at 78.) There exists no evidence to support the Board's conclusion that Mr. Sandusky was provided these tickets in exchange for services rendered after 1999 as opposed to his status as a former football coach—a status from which PSU hoped to prosper.

**B.**

Regardless of whether Mr. Sandusky received "regular remuneration" under the Retirement Code, he does not qualify as a "school employee" because he did not maintain an employee-employer relationship with PSU after 1999. Pursuant to 24 Pa. C.S. §8102, it is not enough that Mr. Sandusky engaged in "work relating to" PSU; rather, to be a "school employee," he had to complete that work on PSU's behalf, as an employee of PSU. *Id.* While it is doubtless that Mr. Sandusky did perform work for The Second Mile relating to PSU, there is no evidence to support the finding that this work was performed *for* PSU.

In concluding that Mr. Sandusky was an employee of PSU, the Board makes much ado about the association between The Second Mile and PSU and Mr. Sandusky's efforts to continue that association after his retirement. To this end, the Board explained:

> [Mr. Sandusky] did work collaboratively with Penn State to promote Penn State's image after 1999. The Letter Agreement had an initial term of five years and necessarily was renewed thereafter because [Mr. Sandusky] continued to work collaboratively with Penn State at least until 2009.

30

The close ties between Penn State and The Second Mile enhanced Penn State's image. The Second Mile and Penn State enjoyed a symbiotic relationship, in which The Second Mile benefited from increased donations and recognition as a result of its association with Penn State, and Penn State benefited by enhancing the reputation of the University and its athletic program through its close alliance with a well-respected charity. [Mr. Sandusky] even admitted at the January 7, 2014 [ ] hearing in this matter that The Second Mile would not have flourished without its close relationship with Penn State. [Mr. Sandusky] personally was the bridge between Penn State and The Second Mile, both before and after 1999….

(12/18/14 Board Decision, at 35−36.)

This analysis misses the mark. Simply because Mr. Sandusky "worked collaboratively with" PSU in his capacity as a leader of The Second Mile does not mean that he worked "for" PSU, nor does the fact that the two entities maintained a strong, mutually beneficial relationship. While Mr. Sandusky may very well have been "the bridge between Penn State and The Second Mile, both before and after 1999," the only evidence indicates that after 1999, he maintained this "bridge" as a full-time consultant for The Second Mile, not as an employee of PSU, even though PSU also benefited from the continued alliance.

As we explained in *Golebieski v. Public School Employees' Retirement Board*, to "work for" a governmental entity is to enter into an employer-employee relationship with that entity. 636 A.2d 268, 270 (Pa. Cmwlth. 1993), *appeal denied*, 642 A.2d 488 (1994). The mere fact that one performs acts which benefit a government entity does not give rise to the conclusion that he is employed by the government entity. Indeed, the fact that an individual performs acts pursuant to a

31

private organization's directive which benefit a governmental entity is of no moment. *See id.* at 270 (explaining that although a claimant taught physical and health education classes in a school district and followed a class schedule and curriculum provided by the school district, he did not work for the school district because he was paid by a private company and performed significant other duties specific to the private employer and unrelated to those duties performed with regard to the school district).

Here, the Board conflated the requirements that Mr. Sandusky engage "in work relating to" PSU and that he engage in that work "for" PSU. 24 Pa. C.S. §8102. Mr. Sandusky's performance of services that benefited PSU does not render him a PSU employee. Although there can be no doubt that Mr. Sandusky engaged in work *relating to* PSU insofar as PSU's and The Second Mile's mission closely aligned with PSU's outreach efforts, there exist no facts to support the Board's finding that he completed outreach "for" PSU as opposed to "for" The Second Mile. The Board glossed over this requirement, instead jumping directly to the *Zimmerman* test which distinguishes between independent contractors and employees based upon the nature of the work performed, the terms and conditions governing such work, and various other factors of the work relationship. However, the *Zimmerman* test does not apply under these circumstances because there has been no showing that Mr. Sandusky worked for PSU beyond 1999 in any capacity and, therefore, there is no need to determine whether this work was done on an employee or independent contractor basis.[21] *See Zimmerman v. Public School Employees' Retirement Board*,

---

[21] Wisely, the Board did not find and does not argue before this Court that Mr. Sandusky's post-1999 speaking engagements at PSU, for which he was separately compensated by PSU, are part of his purported employment relationship. Therefore, we need not analyze whether Mr. **(Footnote continued on next page…)**

522 A.2d 43, 44 (Pa. 1987) (explaining that the ten-factor test applies to determine whether one "is an employee or independent contractor").

Additionally, as in *Golebieski*, here, Mr. Sandusky completed additional tasks which were unrelated to PSU: namely, fundraising for The Second Mile, serving as the Chairman of the Strategic Planning Committee, recruiting a campaign committee and chairing that committee, attending board meetings throughout the Commonwealth, and fulfilling various speaking engagements. Not surprisingly, there is no evidence indicating that Mr. Sandusky participated in outreach efforts with regard to any organization other than The Second Mile, despite the fact that the Retirement Perquisites Agreement stated that his collaborative efforts with PSU would continue with The Second Mile and other organizations.[22]

## C.

Having determined that Mr. Sandusky's pension must be reinstated from October 9, 2012, forward, we next examine the rate of interest, if any, applicable to the withholdings.

---

**(continued…)**

Sandusky acted as an independent contractor or employee insofar as he fulfilled those speaking engagements.

[22] Because we find that Mr. Sandusky was not a "school employee" at the time his underlying criminal actions occurred and, therefore, that the Pension Forfeiture Act does not apply, we need not examine whether application of the Pension Forfeiture Act unconstitutionally impairs his contract rights, as no impairment exists.

## 1.    *Statutory or Contractual Interest*

First, we must analyze whether the Board is under a statutory obligation to pay interest on the withheld retirement allowances. *Braig v. Pennsylvania State Employees' Retirement Board*, 682 A.2d 881, 885 (Pa. Cmwlth. 1996). To this end, it is well recognized that the terms of the Retirement Code "are deemed to be contractually binding on the Commonwealth." *Cianfrani v. State Employees' Retirement Board*, 479 A.2d 468, 472 (Pa. 1984) (*Cianfrani II*).[23]

The Board directs our attention to Section 5954(b) of the Retirement Code, providing:

> **Adjustment of errors.**--Should any change or mistake in records result in any member, beneficiary or survivor annuitant receiving from the system more or less than he would have been entitled to receive had the records been correct, then regardless of the intentional or unintentional nature of the error and upon the discovery of such error, the board shall correct the error and so far as practicable shall adjust the payments which may be made for and to such person in such a manner that the actuarial equivalent of the benefit to which he was correctly entitled shall be paid.

---

[23] *Bellomini v. State Employees' Retirement Board*, 445 A.2d 737 (Pa. 1982) (*Cianfrani I*) was a consolidated appeal in which two former state employees, Cianfrani and Bellomini, challenged the Board's retroactive application of the Pension Forfeiture Act to deny their retirement benefits. Ultimately, the Pennsylvania Supreme Court held that the retroactive application of the Pension Forfeiture Act, which came into law after claimants' retirement rights vested, caused an unconstitutional impairment of the retirement contract obligations and, therefore, invalidated the Act as to anyone whose "retirement benefits rights had vested prior to July 8, 1978." *Id.* at 741. Following that determination, Cianfrani, as a putative class member, sought to collect interest with regard to the wrongfully withheld pension benefits. *Cianfrani II*, 479 A.2d at 469.

71 Pa. C.S. §5954(b). Further, the Retirement Code defines "actuarially equivalent" as "[e]qual present values, computed on the basis of statutory interest and the mortality tables adopted by the board" and specifies that "statutory interest" shall be "[i]nterest at 4% per annum, compounded annually." 71 Pa. C.S. §5102.

However, our Supreme Court expressly considered whether the Retirement Code provides for interest rates on pension benefits withheld by the Board due to a purported forfeiture and subsequently determined to be due and owing in *Cianfrani II*. There, a SERS member and putative class member requested, and the Board denied payment of, his monthly annuity pursuant to a statute which prohibited members from receiving annuities and authorized only lump-sum payments of the contributions the member made during service. 479 A.2d at 469–70. After the Board's denial, the statute was deemed unconstitutional as applied to the member, and he sought interest with regard to his wrongfully withheld annuity. *Id.* at 469.

The Supreme Court determined that there existed no statutory duty to pay interest under the Retirement Code, reasoning:

> The provisions of the Retirement Code which specifically address the subject of interest relate to the mechanics of administration of the fund by the Board and require periodic transfers to individual members' accounts of statutory interest during the control and maintenance of the account by the Board. *See* 71 Pa. C.S.A. [*sic*] §§5931(b), 5933(b). No provision in the Act indicates that the legislature intended that the Board, as an instrumentality of the state government, is to be liable for interest except in its role as trustee and administrator of the retirement fund, and then only as a benefit of successful management and investment of the fund portfolio during the period before retirement when the employee is accumulating a stake in the fund.

35

> Upon either retirement or termination of service, this obligation to credit statutory interest to an individual member's account is terminated by the Retirement Code. Section 5102 provides that in the case of a non-vested member, no interest is to be credited after the date of termination of service; in the case of a vested member, no interest is to be credited after the effective date of retirement.
>
> The Board's obligation to credit Cianfrani's individual member account with statutory interest terminated at the effective date of his retirement, sometime prior to July 8, 1978. *Cianfrani I*, *supra*. Therefore, because Cianfrani's claim for interest relates to a period commencing after his date of retirement, the contractual interest requirements of the Retirement Code do not support his claim. The period during which the Board withheld payment of the monthly annuity is expressly beyond the Commonwealth's statutory and contractual duty, under the Retirement Code, to pay interest.

*Id.* at 472 (internal footnote omitted).

Similarly, *Braig* involved three former judges who were removed from office pursuant to Article V, Section 18 of the Pennsylvania Constitution. *Id.* at 882−84. That Section provides:

> Upon a final order of the court for suspension without pay or removal, prior to any appeal, the justice, judge or justice of the peace shall be suspended or removed from office; and the salary of the justice, judge or justice of the peace shall cease from the date of the order.

Pa. Const. art. V, §18(d)(1). Following their removal, two former judges filed SERS applications electing to receive reduced retirement allowances in the form of a joint and survivor annuity, and the third sought to receive a reduced retirement allowance

36

for life with a guaranteed total payment. SERS denied all three applications, reasoning that Article V, Section 18 created a pension-forfeiture provision, a ruling that was ultimately reversed by our Supreme Court. *Id.*; *see also Glancey v. State Employes' Retirement Board*, 610 A.2d 15 (Pa. 1992). With regard to one of the judges, the Supreme Court also held that the constitutional provision did not apply. *Braig*, 682 A.2d at 884.

Following the Supreme Court's decisions, two former judges and the executrix of the estate of the other former judge sought interest on the pension benefits that the Board wrongfully withheld. *Id.* at 882. In examining this issue, we first analyzed whether the Board was under a statutory obligation to pay interest on the withheld retirement allowances. *Id.* at 885. To this extent, we reasoned:

> *Cianfrani II* conclusively answers in the negative the threshold question of whether [the Board] is under either a statutory or contractual obligation to pay Claimants interest. As in *Cianfrani II,* Claimants' claims for interest here relate to a period commencing after their respective dates of retirement, from the time [the Board] originally denied their retirement benefits until the time the supreme court reversed that denial and ordered their benefits reinstated. Pursuant to *Cianfrani II*, therefore, the period during which [the Board] withheld payment of Claimants' retirement benefits is expressly beyond the Commonwealth's statutory and contractual duty, under the Retirement Code, to pay interest.

*Id.* at 886. Importantly, Section 5954(b) of the Retirement Code was in effect at the time the decisions were rendered in both *Cianfrani II* and *Braig*. *See* 71 Pa. C.S. §5954(b). Thus, to the extent the Board contends that the interest due is determined pursuant to Section 5954(b) of the Retirement Code, 71 Pa. C.S. §5954(b), this

argument is contradicted by well-established precedent conclusively determining that there exists no statutory authority under the Retirement Code for the imposition of interest under these facts.

### 2. Common-Law Interest

Finally, our inquiry turns to whether the Sanduskys are owed interest under the common law pursuant to which "interest is as much a part of the substantive debt as principal…. [because] it is impliedly payable as compensation to a creditor for delay of payment by the debtor whenever a liquidated, or fixed, sum of money is unjustly withheld." *Braig*, 682 A.2d at 886. In order for interest to run, two conditions must be satisfied: (1) the debt must have been liquidated with some degree of certainty; and (2) the duty to pay it must have become fixed. *Id.* When these pre-requisites are satisfied, "any failure of the debtor to timely discharge the principal of the debt at the time fixed for payment will be considered a wrongful withholding of the sum due, warranting an award of interest at the legal rate from the date the money was due and payable." *Id.* at 886–87.

The Board concedes that at the time it withheld the subject pension benefits, the debt was liquidated with a degree of certainty. Regardless, it contends that the second condition was not satisfied because the duty to pay the debt, if any, does not become fixed until the Board's order is reversed, and it cites *Cianfrani II* in support of its position.

As explained above, *Cianfrani II* concluded that there existed no right to statutory interest. 479 A.2d at 472. However, the Court then continued to determine

38

whether a common-law right to interest existed.  *Id.* at 470–72.  Specifically, the Supreme Court held that interest was properly withheld, explaining:

> [B]ecause the Board action arose from compliance with the legislative mandate of Act 140 and its apparent applicability to Cianfrani and others similarly situated, the interest claim cannot be said to arise from any wrongful delay in payment of a sum owed Cianfrani or from any position of *enforceable* liability in the Board.  The Board action was neither wrongful at the outset, nor in retrospect.

*Id.* at 471–72.

Twelve years after *Cianfrani II* was issued, we further explored the application of common-law interest to purported pension forfeitures in *Braig*, where we distinguished the facts of that case from *Cianfrani II*, reasoning that interest payments were appropriate in the latter because:

> At the time Claimants here requested, and SERB denied, their retirement benefits, however, there was no statute in existence which mandated or affirmatively required such denial.  In fact, just the opposite, there was a statute in existence, i.e. the Retirement Code, which affirmatively required SERB to *grant* Claimants' retirement and pension benefits; as recognized by the supreme court in *Glancey,* no then-existing statute or law contained a contrary mandate. Thus, SERB's action in withholding Claimants' retirement and pension benefits was *not,* as in *Cianfrani II,* then lawful or affirmatively required by the legislative mandate of Article V, Section 16(b) of the Pennsylvania Constitution.

*Braig*, 682 A.2d at 888 (internal footnotes omitted).  As such, we awarded the former judges interest at the legal rate from the date the money was due and payable.  *See*

Act of January 30, 1974, P.L. 13, 41 P.S. §202 ("Reference in any law or document enacted or executed heretofore or hereafter to 'legal rate of interest' and reference in any document to an obligation to pay a sum of money 'with interest' without specification of the applicable rate shall be construed to refer to the rate of interest of six per cent per annum.").

As in *Braig*, here, there exists no statute which affirmatively required the Board to deny the Sanduskys' withheld retirement allowances. Indeed, the Retirement Code affirmatively required the Board to *grant* the pension benefits. Simply stated, "in *Cianfrani II*, [the Board] complied with the law; here, [the Board] ignored the law." *Braig*, 682 A.2d at 888 n.16. Because the pension benefits constitute liquidated and enforceable debts, the Board's failure to pay those debts when they became due constitutes a wrongful withholding under the common law. *Id.* at 888. Therefore, the Board is obligated to pay interest at the legal rate of six percent (6%) per annum as damages for delay in discharging its debt. *Id.*

Accordingly, because the Board had no reasonable basis whatsoever to find that Mr. Sandusky was an employee of PSU when the underlying actions occurred, we reverse the Board's order, reinstate the pension benefits, and remand this case to the Board for a determination of the legal rate of interest due and owing in accordance with this decision and pay all amounts due.

_____
DAN PELLEGRINI, President Judge

Judge Cohn Jubelirer did not participate in the decision in this case.

40

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Gerald A. and Dorothy D. Sandusky,  :
                      Petitioners  :
                                        :
                 v.                       :
                                          :
Pennsylvania State Employees'    :
Retirement Board,                :
                        Respondent  :   No. 60 C.D. 2015

# **O R D E R**

AND NOW, this 13th day of November, 2015, we reverse the order of the Pennsylvania State Employees' Retirement Board (Board) in the above-captioned matter and remand this case to the Board for a determination of the legal rate of interest due and owing and pay all amounts due.

Jurisdiction relinquished.

_____
DAN PELLEGRINI, President Judge